Katherine Neville BRADFORD, Plaintiff,

v.

Michael MUINZER, Muinzer Moving & Storage Co. and Bekins Company, Defendants.

No. 78 C 2530.

United States District Court, N. D. Illinois, E. D.

Oct. 20, 1980.

Fay Clayton, Sachnoff, Schrager, Jones, Weaver & Rubenstein Ltd., Chicago, Ill., for plaintiff.

David J. Pritchard, McKenna, Storer, Rowe, White & Farrug, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

WILL, District Judge.

Katherine Bradford filed this action against Muinzer Moving & Storage Co., Michael Muinzer, and Bekins Company, seeking damages for the wrongful sale of household goods which had been packed, moved, and stored by the defendants. Bradford has moved for summary judgment against Michael Muinzer and Muinzer Moving & Storage on the issue of liability. For the reasons stated below, we grant Bradford's motion.

## BACKGROUND

In August 1974, Bradford hired Muinzer and Bekins to pack and transport her household belongings from Chicago to Florida. According to the Interstate Order for Service prepared at this time, her goods were valued at $35,000. As ordered, Bekins packed and shipped the goods to Muinzer's warehouse in Lafayette, Indiana where they were to be stored pending later shipment to Florida. The goods remained in the warehouse until July 1978.

In May 1978, Muinzer decided to sell Bradford's property to pay the $3,000 to $4,000 in overdue shipping and storage charges. On May 20, Muinzer sent a letter to Bradford at the Lafayette, Indiana address she had put on the Interstate Order for Service, demanding payment of the overdue charges. The letter stated that Muinzer claimed a lien on the goods in the amount of $3,295.01 and warned that if Bradford did not pay the charges by May 28, "the goods will be duly advertised for sale and sold at public auction." This letter was returned, unopened, to Muinzer.

On June 8, 15, and 22, 1978, Muinzer placed a notice of sale with a local newspaper, *The Lafayette Leader*, stating that "Lot 366566–Katherine Bradford" would be sold on June 26, 1978. The goods were not sold on this date, however, and on July 20 and 27, 1978, Muinzer placed a similar notice of sale with the paper. This notice read:

### NOTICE
### OF SALE

Notice is hereby given that the undersigned pursuant to the provision of Chapter 182 of the acts of the Indiana General Assembly of 1919 will meet on:

July 29, 1978
6:30 p. m. at
Anderson Auction
Lafayette, In.

Lot 517– –Robert Bell
Lot 446– –June Gilliam
Lot 366566– –Katherine Bradford

Anyone wanting to know the exact time and date. Contact Muinzer Moving and Storage Co.

MUINZER MOVING
& STORAGE
1315 Ferry
Lafayette, In.

7 20, 27

Meanwhile, Bradford, dissatisfied with the way Bekins and Muinzer had handled her belongings, filed suit in this court seeking damages for injury to her property. Muinzer received the complaint on July 24, 1978, five days before the auction was scheduled to take place. Although Muinzer noticed that the complaint listed a Chicago address for Bradford, he never tried to reach her at this address to inform her of the impending sale.

All of Bradford's goods were sold by a local auctioneer in Lafayette on July 29, 1978. The sale brought $9,274.50. The auctioneer retained a $2,318.62 commission and deducted $69.97 to cover the cost of the repair of a television set sold. The remainder, $6,885.91 was remitted to Muinzer. From this amount, Muinzer deducted

$3,295.01 to cover the overdue storage charges and sent the balance to Bradford.

## MUINZER'S COMPLIANCE WITH § 7–210

A principal issue in this case is whether Muinzer, in selling Bradford's belongings, complied with the provisions of § 7–210 of the Uniform Commercial Code, Ind.Code § 26–1–7–210. This section, which governs a warehouseman's sale of goods to satisfy his lien, provides:

(1) Except as provided in subsection (2), a warehouseman's lien may be enforced by public or private sale of the goods in block or in parcels, at any time or place and on any terms which are commercially reasonable, after notifying all persons known to claim an interest in the goods. . . .

(2) A warehouseman's lien on goods other than goods stored by a merchant in the course of his business may be enforced only as follows:

(a) All persons known to claim an interest in the goods must be notified.

(b) The notification must be delivered in person or sent by registered letter to the last known address of any person to be notified.

(c) The notification must include an itemized statement of the claim, a description of the goods subject to the lien, a demand for payment within the specified time not less than ten (10) days after receipt of the notification, and a conspicuous statement that unless the claim is paid within that time the goods will be advertised for sale and sold by auction at a specified time and place.

(d) The sale must conform to the terms of the notification.

(e) . . .

(f) After the expiration of the time given in the notification, an advertisement of the sale must be published once a week for two (2) weeks consecutively in a newspaper of general circulation where the sale is to be held. The advertisement must include a description of the goods, the name of the person on whose account

they are being held, and the time and place of the sale. The sale must take place at least fifteen (15) days after the first publication.

Bradford argues that Muinzer failed to comply with the provisions of § 7–210 in selling her belongings. We agree in part and disagree in part with her contentions.

■ Bradford's first assertion is that Muinzer should have sent the notification of sale to the Chicago address, of which he first learned five days prior to the sale, rather than to the Lafayette address listed on the Interstate Order for Service. According to Bradford, it is not sufficient for a warehouseman to send the notice to the bailor's last known address; if at any time before the sale the warehouseman learns of another address, he must send a notice there. We believe, however, that Bradford's interpretation of § 7–210 puts a greater burden on the warehouseman than was intended. Where a warehouseman does not learn of a bailor's new address until shortly before the sale, a notice sent to the new address may not comply with the provisions of § 7–210(2), due to the short period between the sending of the second notice and the sale, unless the warehouseman postpones the sale. It would be unreasonable to expect a warehouseman to postpone a sale and publish new notices of sale whenever he learns of a new address for the bailor. Consequently, where, as here, the warehouseman sent notice to the bailor's last known address, he has done all that § 7–210 requires.

■ Bradford's second contention, that the notification of sale sent to her was inadequate under § 7–210, is correct. Section 7–210(2)(c) requires that the notice state the time and place at which the goods will be sold. Muinzer's letter to Bradford failed to mention either.

■ Although Bradford has not raised this issue, there is another problem with the notification of sale sent to her. Section 7–210(2)(c) requires that the notification include a "conspicuous statement that unless the claim is paid within [the time stated]

the goods will be advertised for sale and sold by auction . . . ." Section 1–201(10) of the UCC, Ind.Code § 26–1–1–201(10), states:

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals . . . is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. . . . Whether a term or clause is "conspicuous" or not is for decision by the court.

The notification sent to Bradford refers in undistinguished type in the body of the letter to the possible sale of her goods. This reference is not "conspicuous" as that term is used in the UCC.

█ █ Bradford's third contention is that the published notices of sale did not include an adequate description of her goods. The published notice merely stated that "Lot 366566–Katherine Bradford" would be sold at auction. Muinzer argues that this description is adequate under section 7–210(2)(f), since all this section requires is that the notice be sufficient to put persons claiming an interest in the goods on notice that the goods will be sold.' However, in *Grundey v. Clark Transfer Co.*, 42 N.C.App. 308, 256 S.E.2d 732 (1979), the court considered the adequacy of a published notice which read "the following lot of household goods, to wit: The property of G. Grundey" would be sold at auction. The court concluded.

[T]his advertisement does not include a description of the goods sufficient to comply with subsection (f). We believe that the purpose of the requirement is to insure that those who might be interested in buying the items will be present at the sale. This purpose is not adequately served by the use of the general term "household goods," where, as here, the goods to be sold include such varied items as a stereo, color TV, lawn mower, aquarium, and washing machine.

*Id.* 256 S.E.2d at 736. Like the court in *Grundey*, we believe that the purpose of

section 7–210(2)(f)'s requirement of a published notice is also to insure that those interested in purchasing the goods will be present at the auction and, consequently, that the sale will bring a fair return. It is clear that the. description included in the present case could not have served this purpose. Thus, it is inadequate under section 7–210.

█ Bradford also asserts that the sale was held too soon after the first published notice of sale. Section 7–210(2)(f) provides that the first published notice must appear at least 15 days before the date of sale. *See Kellenberger v. Bob Meyers Moving and Storage Co.*, 595 P.2d 1229, 1232 (Okl. App.Ct.1979). In the present case, the first published notice stating the correct date of sale appeared on July 20, 1978; the sale occurred on July 29, 1978, less than 15 days later.

Bradford next contends that Muinzer violated section 7–210 by selling more goods than were necessary to cover the overdue charges. She points to section 7–210(1) which states, in relevant part:

[A] warehouseman's lien may be enforced by public or private sale of the goods in block or in parcels at any time or place and on any terms which are commercially reasonable. . . . A sale of more goods than apparently necessary to be offered to insure satisfaction of the obligation is not commercially reasonable. . . .

As Muinzer was aware, Bradford stated in the Interstate Order for Service that her belongings were worth $35,000. As Muinzer also was aware, his lien was for only $3,295.01. Given these facts, says Bradford, Muinzer's decision to sell all of her property was improper.

Muinzer replies first that section 7–210(1) applies only to warehouseman's liens on goods stored by merchants, whereas this case involves goods stored by a nonmerchant. There are no cases that have addressed the question whether section 7–210(1) applies only to sales of merchants' goods or to sales of all goods, and the drafters' and Indiana comments are silent on this question, Muinzer points out that

subsection (1) begins "Except as provided in subsection (2) . . ." and that subsection (2) begins "A warehousemen's lien on goods other than goods stored by a merchant in the course of his business may be enforced only as follows . . . ." Thus, he argues, since subsection (2) applies only to nonmerchants' goods, subsection (1) must apply only to merchants' goods. The Illinois Code Comment accompanying section 7–210 apparently accords with Muinzer's view. With respect to subsection (1) the comment states:

> This subsection and [subsection (2)] recognize a difference in the situation of commercial storage . . . and the situation of noncommercial storage, which includes that of household goods stored by a consumer. The provisions of this subsection apply to commercial storage.

■ Muinzer's reading of section 7–210 is not, however, the only or, we believe, the best interpretation of the first clause of subsection (1). The better interpretation, we conclude, is that subsection (1) governs *all* sales of goods subject to a warehouseman's lien except to the extent that subsection (2) imposes stricter or additional requirements on a warehouseman's selling a nonmerchant's goods. When other UCC provisions apply only to merchants, the provisions so state explicitly rather than by inference. *See, e. g.,* UCC section 2–205, section 2–603. Moreover, the reason for section 7–210(2)'s strict requirements is to prevent overreaching by warehousemen and transporters. *Kellenberger v. Bob Meyers Moving and Storage Co., supra* at 1232. Thus, it seems highly unlikely that the requirement that a sale be commercially reasonable is applicable to sales of merchants' goods but inapplicable to sales of nonmerchants' goods.

Assuming that subsection (1) applies, Muinzer argues that he nonetheless was justified in selling all of Bradford's goods. He cites *Schmidt v. Cowen Transfer and Storage Co.,* 170 Colo. 550, 463 P.2d 445 (1970), in which the court held that a warehouseman who sold part of a nonmerchant's goods to satisfy a lien should have sold all

of them. *Id.* 463 P.2d at 447. Although *Schmidt* was decided under a provision of the Uniform Warehouse Receipts Act, the predecessor of Article 7 of the UCC, Muinzer argues that section 7–210 is basically a recodification of the UWRA. Muinzer overlooks, however, that unlike section 7–210(1), the UWRA did not include a specific prohibition against a warehouseman's selling more goods than apparently necessary to satisfy his lien. *Schmidt* is, therefore, irrelevant.

■ Muinzer also contends that he had serious reservations about whether a sale of all of Bradford's property would satisfy his lien. Because of his doubt, Muinzer argues, he did not sell "more goods than apparently necessary" to insure satisfaction of the lien and, thus, did not violate section 7–210(1). Whether Muinzer sold more goods than necessary to cover his lien on Bradford's goods is a question of fact. *Cf. Hall v. Owen County State Bank,* 370 N.E.2d 918, 929 (Ind.App.1977) (whether secured party's sale under UCC section 9–504 was "commercially reasonable" is a question of fact); *Gulf Homes v. Goubeaux,* 124 Ariz. 142, 602 P.2d 810, 812 (1979). While the facts in this case suggest that Muinzer's sale of goods purportedly valued at $35,000 to cover a $3,300 lien was unnecessary, the issue cannot be resolved on the basis of the information we have at present: Muinzer's deposition testimony regarding his subjective opinion and Bradford's estimate, at the time the goods were turned over to Muinzer, of the value of her property.

■ Bradford's final contention is that Muinzer violated section 7–210 when he repaired her television before the auction without her permission. She argues that, absent express authority to undertake such repairs, a warehouseman cannot do so. We disagree. A warehouseman has implied authority under section 7–210(1) to repair or refurbish property before sale. Section 7–210(1) expressly states that a warehouseman's sale must proceed in a "commercially reasonable" manner. It is "commercially reasonable" for a warehouseman to repair an item which is to be sold if the repair will

significantly enhance the value of the item and insure that it brings a higher price at the sale, provided, of course, that the cost of the repair does not exceed the expected increase in the item's value.

■ Section 9–504 of the UCC, Ind.Code section 26–1–9–504, supports this notion. Sections 9–504 and 9–507 govern a secured party's sale of collateral to satisfy an overdue debt. These sections, like section 7–210, provide that the sale must be conducted in a "commercially reasonable" manner. Courts have held that in some cases a secured party's failure to repair or refurbish collateral prior to sale was not commercially reasonable. *See, e. g., Connex Press, Inc. v. Int'l Airmotive, Inc.*, 436 F.Supp. 51, 55–57 (D.D.C.1977) (failure to repair defects such as broken windows in an airplane prior to sale was not commercially reasonable); *Liberty Nat'l Bank & Trust Co. of Oklahoma City v. Acme Tool Division of Rucker Co.*, 540 F.2d 1375, 1381–82 (10th Cir. 1976) (failure to clean, paint, and dismantle an oil rig before sale was not commercially reasonable). Of course, unlike section 7–210, section 9–504 expressly provides that a secured party may "prepare" collateral for sale if it would be commercially reasonable to do so. Nevertheless, that it is commercially reasonable for a secured party disposing of collateral to prepare the collateral for sale is a strong indication that it is commercially reasonable for a warehouseman to prepare bailed goods for sale. Thus, contrary to Bradford's assertion, we believe Muinzer had implicit authority under section 7–210 to repair Bradford's goods prior to sale if to do so would enhance their value. Moreover, Muinzer was entitled to deduct the cost of repairs from the proceeds of sale under section 7–209(1), Ind.Code section 26–1–7–209(1) (allowing warehousemen to deduct from the proceeds of sale expenses reasonably incurred in the course of it).

## MUINZER'S EQUITABLE DEFENSES

In defense, Muinzer argues that he acted in good faith while Bradford acted in bad faith. Muinzer points specifically to Bradford's apparent refusal to open any correspondence sent by Muinzer. Because of her bad faith actions, he asserts, she should be barred from recovering under section 7–210. Bradford has moved to strike this defense.

■ Muinzer's defenses should be stricken. Muinzer points to nothing which suggests that bad faith on the part of the bailor excuses the warehouseman's failure to follow the procedure for selling bailed goods set out in section 7–210, and our research has produced nothing so suggesting. Conversely, so far as Muinzer's good faith is concerned, nothing in our research or in Muinzer's brief suggests that a warehouseman's good faith excuses his failure to adhere to section 7–210. Whether or not a warehouseman acted in good faith may determine the extent of his liability under section 7–210, i. e., whether he is liable for actual damages or for conversion. But, good faith does not entirely excuse a warehouseman's failure to comply with section 7–210.

## THE EFFECT OF NONCOMPLIANCE WITH SECTION 7–210

Under section 7–210(9), "[t]he warehouseman is liable for damages caused by failure to comply with the requirements of sale under this section and in case of willful violation is liable for conversion." Muinzer argues that, at most, he is liable for the actual damages Bradford suffered as a result of his "technical" failure to comply with section 7–210. Before Muinzer could be held liable for conversion, Bradford would have to demonstrate that Muinzer's violation was "willful," i. e., that the violation was part of a deliberate design or that Muinzer acted with malice. Bradford replies that malice or bad faith is not a necessary component of "willfulness." It is sufficient, she argues, that Muinzer acted deliberately, as opposed to inadvertently.

The drafters comments and Indiana comments accompanying section 7–210 are silent as to the meaning of "willful." Cases under section 7–210 are equally unenlightening. Two courts that have considered this question have concluded, without any discussion, that a violation of section 7–

210's requirements results in liability for conversion. *See Flores v. Didear Van & Storage Co.*, 489 S.W.2d 406, 409 (Tex.Civ. App.1972); *Kellenberger v. Bob Meyers Moving & Storage Co.*, supra at 1232. Other courts that have addressed this issue have concluded, also without discussion, thåt a violation of this section results in liability only for actual damages caused by the violation. *See United Elastic Corp. v. Roadway Express, Inc.*, 5 UCC Rep.Serv. 1008, 1010 (N.Y.Sup.Ct.1968); *Grundey v. Clark Transfer Co.*, 42 N.C.App. 308, 256 S.E.2d 732, 736 (1979). Unfortunately, none of these courts reported sufficient facts for us to infer a definition of "willful."[1]

Courts that have tried to define "willful" in the context of other civil statutes lend some aid. These courts generally agree that a "willful" violation of a statute is an action taken deliberately or intentionally with knowledge of the statute's application and with disregard of the action's legality. *See, e. g., Turner v. Lyon*, 189 Colo. 234, 539 P.2d 1241, 1243 (1975) (statute governing landlords' handling of tenants' security deposits); *Intercounty Construction Co. v. Occupational Safety & Health Review Comm'n*, 522 F.2d 777, 779–80 (4th Cir. 1975), *cert. denied*, 423 U.S. 1072, 96 S.Ct. 854, 47 L.Ed.2d 82 (1976) (OSHA); *Walker v. Security Trust Co. of Rochester*, 85 Misc.2d 614, 379 N.Y.S.2d 308, 316 (N.Y. Sup.Ct.1976) (Motor Vehicle Sales Act); *Herman v. Roosevelt Federal Savings & Loan Ass'n*, 432 F.Supp. 843, 851 (E.D.Mo. 1977), *aff'd*, 569 F.2d 1033 (8th Cir. 1978) (Fair Labor Standards Act). These courts also generally agree that, in civil statutes, for a violation to be "willful" the actor need not have had a bad purpose or evil motive. *See, e. g., Herman v. Roosevelt Federal*

*Savings & Loan Ass'n*, supra at 851; *Intercounty Construction Co. v. Occupational Safety & Health Comm'n*, supra at 780.

We conclude that the term "willful" violation in section 7–210(9) means, as it does in other civil statutes, a deliberate or intentional action taken with knowledge of the statute's application and with disregard of the action's legality.

Moreover, based on the undisputed facts in this case, it appears that Muinzer's violation of section 7–210 was willful. He unquestionably was aware of section 7–210, its requirements, and its applicability to his sale of Bradford's property. Nevertheless, Muinzer failed in a number of respects to comply with that section's requirements. At no time has he contended that his failure to comply was accidental. These facts, coupled with the fact that Muinzer decided to proceed with the auction after he learned of Bradford's having filed suit for injury to her property, convinces us that he acted in disregard of the legality of his actions. We conclude, therefore, that Muinzer is liable for conversion of Bradford's property pursuant to section 7–210(9).

## CONCLUSION

An appropriate order granting Bradford's motion for summary judgment against Michael Muinzer and Muinzer Moving & Storage Co. will enter.

---

1. Only one court has attempted to distinguish between a "willful" violation and a simple violation. In *Long's Transfer & Storage v. Busby*, 358 So.2d 393 (Miss.1978), the court concluded that a "willful violation" of section 7–210 was more than a mere mistaken, erroneous, or inadvertent violation of that section's requirements. *Id.* at 396. In that case, there was no willful violation of section 7–210 where due to the publisher's error the published notice of sale incorrectly stated the date of the auction. However, because there was no reason to do so, the court did not attempt to define "willful violation" beyond stating that it involved more than a mere mistake. Consequently, *Long's Transfer & Storage's* definition is of little help.